AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the
Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>**four Google accounts, more particularly described in<br>Attachment A** | )<br>)<br>)<br>)<br>)<br>)    Case No.    MJ20-5237 |

```
————— FILED ————— LODGED
————————RECEIVED

Oct 09, 2020

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY ————————————————— DEPUTY
```

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

four Google accounts, more particularly described in Attachment A,

located in the _____**Northern**_____ District of _____**California**_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841a | Drug trafficking |
| 18 USC 1956 | Money Laundering |

The application is based on these facts:

See attached Affidavit of DEA TFO Mike Afalava, incorporated by reference herein.

☑ Continued on the attached sheet.

☑ Delayed notice of _365_ days *(give exact ending date if more than 30 days:* _10/08/2020_ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Mike Afalava, DEA Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____**telephone appearance**_____ *(specify reliable electronic means).*

Date: _____**10/09/2020**_____

*Judge's signature*

City and state: **Tacoma, Washington**

J. Richard Creatura, United States Magistrate Judge
*Printed name and title*

USAO2020R00758

**AFFIDAVIT**

STATE OF WASHINGTON      )
                                 )     ss
COUNTY OF PIERCE           )

     I, Task Force Officer Mike Afalava, being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION AND AGENT BACKGROUND

     1.     I am a Task Force Officer with the Drug Enforcement Administration, and have been since February 2017.  I have been employed as a police officer for over nine years.  I am assigned to the Kent Police Department Special Investigations Unit (SIU), and have been working as a narcotics detective for the last five years.  In 2017, I was assigned to the Drug Enforcement Administration (DEA), Seattle Field Office, as a Task Force Officer (TFO) with the Valley Narcotics Enforcement Team (VNET).  As a TFO, I am cross-deputized by the DEA to operate as a federal agent to investigate crimes within the meaning of 18 U.S.C. § 2510(7).  As a TFO, I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. Trainings that I have completed in relation to my current position as a narcotics investigator are DEA Task Force Officer School, Undercover School, FinCen Training, Cellebrite Certified Operator and Physical Analyzer, Reid Interview Technique Program, Narcotics Interdiction, Street Crimes Investigations, Confidential Informant Handling, Marijuana Indoor Grows, Street Gangs, Drug Trafficking Organizations, and Money Laundering.

     2.     My duty assignment includes investigating violations of federal and state controlled substance laws.  My law enforcement experience includes my participation in numerous investigations of organizations trafficking in controlled substances and as a result, I have an understanding of the manner in which drugs are distributed and the

AFFIDAVIT OF TFO MIKE AFALAVA - 1
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   various roles played by individuals and groups in the distribution.  Throughout the course

2   of my training, and in my nine years of law enforcement, I have become familiar with the

3   methods of drug trafficking, and have interviewed over 100 suspects and criminal

4   informants, and others familiar with the drug trade.  I am familiar with the appearance,

5   prices, and transport methods of illegal controlled substances.

6   ## II.     PURPOSE OF AFFIDAVIT

7   3.       The United States, including the DEA and the Kent Police Department

8   (Kent PD), is conducting a criminal investigation into Ken NG, Chaobin YU, Peter LAI,

9   and others regarding possible violations of Title 21, United States Code, Section

10  841(a)(1) (Distribution of Controlled Substances) and Title 18 United States Code,

11  Section 1956 (Money Laundering).  As described in this affidavit, I believe NG, YU,

12  LAI, and their associates are shipping large quantities of marijuana from the Western

13  District of Washington to other locations, including New York and New Jersey.  As

14  described below, investigators already have seized hundreds of pounds of processed

15  marijuana, over $2,000,000 in cash drug proceeds, and thousands of marijuana plants.

16  4.       This affidavit is made in support of an application for a search warrant for

17  information associated with four accounts that is stored at premises controlled by an

18  electronic communications service and/or remote computer service provider, namely

19  Google LLC (formerly Google, Inc., and referred to simply as "Google"), located in

20  Mountain View, California.  The information to be searched is described in the following

21  paragraphs and in Attachment A, which is incorporated herein.  This affidavit is made in

22  support of an application for a search warrant under Title 18, United States Code,

23  Sections 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the

24  government copies of the information, including the content of communications, further

25  described in Attachment B, pertaining to the following four Google accounts

26  (collectively, the "**Target Accounts**"):

27  - xinliu111973@gmail.com (**Target Account 1**),

28  - juicheteng@gmail.com (**Target Account 2**),

AFFIDAVIT OF TFO MIKE AFALAVA - 2
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

- peterlai666@gmail.com (**Target Account 3**), and

- wuken23@gmail.com (**Target Account 4**).

5.     Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

6.     Based on my training and experience, there is probable cause to believe that violations of Title 21, United States Code, Sections 841 and 846, and Title 18, United States Code, Section 1956, have been committed by the users of the Target Accounts, "Fada Chen," "Juiche Teng," Peter LAI, and Ken NG, and others, known and unknown. There is also probable cause to search the information described in Attachment A, to seize evidence, fruits, and instrumentalities of these crimes further described in Attachment B.

7.     This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. §§ 2711, 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A). Specifically, the Court is "in a district court of the United States… that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

### III.   PROBABLE CAUSE

8.     As discussed above, I am investigating the interstate distribution of marijuana and related money laundering crimes.  Because this affidavit is being submitted for the limited purpose of obtaining a search warrant for the Target Accounts referenced above, I have not included every fact known to me concerning this investigation.  Rather, I have set forth only the facts that I believe are necessary for a fair determination of probable cause and to show that there is probable cause to issue the requested warrant.

AFFIDAVIT OF TFO MIKE AFALAVA - 3
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

## April 2020 Seizure of Processed Marijuana

9.      On April 20, 2020, at approximately 6:45 pm, Kent PD Officer Adam Ferguson was dispatched to a report of a suspicious package at Pilot Freight Service (PFS), located at 22217 68th Ave S Kent, Washington.  Upon arrival, Officer Ferguson spoke with the reporting party, Dianne Rose.  Dianne stated she is an employee of PFS, a company dispatched through a third-party internet service called FreightQuote.com.  PFS had been contracted to pick up a prepackaged crate (Shipment #082536194) earlier that day from East Valley Storage, located at 18250 East Valley Hwy Kent, Washington.

10.      The PFS driver picked up the crate and returned to the PFS warehouse. The driver told Dianne and another PFS employee that the client and crate seemed suspicious.  Dianne checked the paperwork and stated there were several red flags.  For example, the paperwork listed the crate as filled with gardening supplies, but the packaging did not reflect that.  Additionally, the final destination of the crate was a storage facility in Orlando, Florida; this was a red flag because Dianne believed it unlikely anyone would be shipping gardening supplies via ground freight to Orlando, as it would not be cost effective.  Dianne also stated it is suspicious when a client wants to pick up a crate at one storage unit, and then deliver it to a storage unit in another state. Dianne further stated that it is PFS's company policy to examine any crate or package to verify its contents for any safety issues.  Dianne and the other PFS employee examined the crate and noticed the client had shrink-wrapped plastic on the outside of the crate, and when they looked at the corners of the plywood it appeared to have been glued shut. Dianne stated this was very unusual for a client to do as it made it very difficult to open the crate once it arrives at its destination.  Dianne went on to explain to Officer Ferguson that they typically see crates that have screws in the outside corners to keep the crate secure during shipping but easily taken apart upon arrival.

11.      Dianne and the other employee opened the crate and found large black garbage bags inside.  The black bags contained what Dianne believed was marijuana.

AFFIDAVIT OF TFO MIKE AFALAVA - 4
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 Pacific Avenue, Suite 700
Tacoma, Washington 98402
(253) 428-3800

1  She and the other employee estimated the weight of the marijuana found in the black

2  bags to be around 184 pounds.

3      12.    Officer Ferguson noted that inside the crate were eight large black plastic

4  bags which contained what he believed to be several smaller vacuum-packed bags of

5  marijuana buds.  Each black plastic bag was labeled with a unique letter and number.

6  The vacuum-packed bags of marijuana were also labeled with a letter and numbers.

7  Officer Ferguson placed the large black plastic bags inside his patrol vehicle and the

8  (now empty) crate was secured inside a locked fenced area at the PFS warehouse.

9  Officer Ferguson told Dianne that he would be in contact over the next few days, to

10  notify them if law enforcement needed the crate.

11     13.    Officer Ferguson transported the marijuana back to the Kent PD to submit

12  it into evidence. Officer Ferguson weighed the large plastic bags prior to removing any of

13  the vacuum-packed bags inside of them.  As noted above, the bags were already labeled

14  with a letter and number.  The labels and weights were as follows:

15     "L2 25" = 27.4 lbs.

16     "L2t 12" = 13.4 lbs.

17     "L1 17" = 19 lbs.

18     "L1 20" = 22.2 lbs.

19     "L1 18" = 20 lbs.

20     "L2 15" = 17 lbs.

21     "L1 20/2" = 22.8 lbs.

22     "L2 23" = 27 lbs.

23  The total weight of the marijuana in the eight large black plastic bags was 168.8

24  pounds.

25     14.    As Officer Ferguson and Sergeant Timothy Ford got ready to put the

26  marijuana into Kent PD evidence, they noticed the labeling on the large plastic bags

27  appeared to have a system, i.e., the second number on the garbage bag listed the number

28  of smaller packages inside the larger bag.  For example, the bag labeled "L2 25" had 25

AFFIDAVIT OF TFO MIKE AFALAVA - 5
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   smaller vacuum-packed bags inside it, and the bag labeled "L1 17" had 17 smaller

2   vacuum-packed bags inside it.  Officer Ferguson and Sgt. Ford removed each individual

3   vacuum-packed bag from the large garbage bags.  They then photographed all the

4   individual vacuum-packed bags and repackaged them in evidence bags to be sealed.

5   Some of the black bags had a large number of individual bags and needed to be split into

6   two separate evidence bags.  This was documented on the evidence tags and all the bags

7   of marijuana were weighed again prior to placing them in evidence.  Det. Yagi would

8   later field-test a sample of the seized marijuana and confirm it was in fact marijuana; he

9   also sent a sample to the Washington State Patrol (WSP) laboratory for testing.

10  **PFS Dash Camera Video**

11        15.     On April 23, 2020, KPD Sergeant Heather Vance assigned the case to

12  Detective Daniel Yagi.  Sergeant Vance had already been in communication with Dianne

13  Rose from PFS.  Sgt. Vance forwarded multiple emails from Dianne to Det. Yagi.  The

14  emails contained a total of 12 surveillance videos, captured from the PFS dash camera

15  mounted on their delivery truck.  There were no time stamps on the videos, but Dianne

16  had informed Sgt. Vance the videos were from the delivery on April 20, 2020.  The first

17  video depicted nothing of note.  The second video depicted the delivery truck pulling into

18  the East Valley Storage lot.  As the truck pulled in, an Asian male (later identified as Ken

19  NG) was waiting outside the main locked gate.  NG was wearing a black t-shirt with a

20  design on the front, dark jeans, and white shoes.  The third video depicted the delivery

21  truck pulling past the open gate after NG entered the code.  The fourth video showed the

22  delivery truck pull off to the side so that NG could catch up and guide him to the unit.

23  When NG passed in front of the truck he looked back and the camera captured an image

24  of his face.  On the next page, the photographs on the left are still shots from the delivery

25  truck dash camera; the photograph on the right is NG's Washington Department of

26  Licensing (DOL) driver's license photograph.  This photo comparison, along with vehicle

27  registration information for a white BMW X5 (described below) led investigators to

28  identify NG as the Asian male depicted in these videos.

AFFIDAVIT OF TFO MIKE AFALAVA - 6
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

  

16.     The fifth video showed NG walking south through the complex and then turning east at the southernmost row of storage units.  The sixth video showed NG and the delivery truck pull up to a storage unit with the numbers "354" above the roll-up door.  NG pointed to Unit "354" as if to indicate this was the correct unit.  As depicted in the still shot from the dash camera below, a large silver truck was parked in front of the unit along with a dark Toyota 4-Runner.



AFFIDAVIT OF TFO MIKE AFALAVA - 7
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

17.     The seventh video showed the delivery truck pull over to the side so that the crate could be loaded (this process was not captured since there was no a rear-facing camera).  Moments later, a white BMW SUV drove past the truck.  The eighth, ninth, and tenth videos showed the delivery truck following the white BMW out of the complex. The eleventh video showed the white BMW paused for the security gate to open, long enough to read the license plate "HAWK168" on the BMW.  DOL records show that plate is assigned to a vehicle owned by Ken NG, who lives at 19700 Talbot Rd S, Renton, Washington.  This information led investigators to believe NG was the person escorting the delivery truck into the storage complex.



18.     The twelfth and final video depicted the white BMW pulling off in front of the office as the delivery truck turned northbound onto East Valley Hwy.  The truck driver later informed Det. Yagi that both the white BMW SUV and a Toyota 4-Runner followed him out of the lot.

**Request for Information from East Valley Storage and Freightquote.com**

19.     Det. Yagi requested information from East Valley Storage on the renter of Unit 354 at East Valley Storage.  On April 24, 2020, East Valley Storage responded, and

AFFIDAVIT OF TFO MIKE AFALAVA - 8
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  identified the unit as "E354" (a 20' x 20' unit), which was rented by "Fada Chen," with
2  an address of 461 Old Stamford Rd, New Canaan, CT 06840.  The listed phone number
3  was 206-319-6935, and the listed email address was xinliu111973@gmail.com (**Target**
4  **Account 1**). A photocopy of Chen's Connecticut driver's license was attached.  The
5  photo depicted a young Asian male with a birthdate in 1980.  The alternate contact was
6  "Tony Chen" with a phone number of 206-499-6686.  The starting rental date was March
7  9, 2020, and the first monthly payment of $613 was made in cash, with the second
8  monthly payment made via a money order.

9      20.     Det. Yagi also send a request to Freightquote.com, for information on the
10  customer account that arranged the "garden equipment"/seized marijuana shipment
11  (Shipment #082536194).  Freightquote.com responded, and said the account used to
12  arrange Shipment #082536194 was under the company name "Best Garden Supply," with
13  a listed address of 132-41 Maple St, Flushing New York, and phone number of 415-910-
14  0172.  The contact name on the account was "Juiche Teng," and the contact email
15  address was juicheteng@gmail.com (**Target Account 2**).

16      21.     I believe this customer account was used to set up a multitude of suspected
17  cross-country marijuana shipments.  The information listed in the table graph below was
18  provided in the response from Freightquote.com. In most of the shipments, the items
19  were listed as "garden supply."  The shipments' weights were between 400-450 pounds
20  each.  The shipments associated with the "Best Garden Supply" account (in reverse
21  chronological order) were as follows:

| Date | Shipper | Consignee | Note |
|---|---|---|---|
| 4/20/2020 | East Valley Storage 18250 E Valley Hwy, Kent, WA 98032 Fade Ma 917-239-0067 | Extra Space Storage 1420 N Orange Blossom Trl Orlando, FL 32804 Jing Ma 917-242-6575 | 1 pallet / 400 lbs |

//

//

AFFIDAVIT OF TFO MIKE AFALAVA - 9
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

| Date | Shipper | Consignee | Note |
|---|---|---|---|
| 2/3/2020 | Extra Space Storage<br>14750 Foothill Blvd.<br>Fontana, CA 92335<br>Long<br>626-525-9436 | Public Storage<br>3204 Northern Blvd.<br>Long Island City, NY 11101<br>Fada Chen<br>646-610-2285 | 1 pallet/ 400 lbs |
| 1/27/2020 | Extra Space Storage<br>14750 Foothill Blvd.<br>Fontana, CA 92335<br>Long<br>626-525-9436 | Public Storage<br>3204 Northern Blvd.<br>Long Island City, NY 11101<br>Fada Chen<br>646-610-2285 | 1 pallet / 450 lbs |
| 1/17/2020 | Extra Space Storage<br>14750 Foothill Blvd.<br>Fontana, CA 92335<br>Long<br>626-525-9436 | Public Storage<br>3204 Northern Blvd.<br>Long Island City, NY 11101<br>Fada Chen<br>646-610-2285 | 1 pallet / 450 lbs |
| 1/13/2020 | Public Storage<br>2090 Evans Ave.<br>San Francisco, CA 94124<br>ken<br>415- 849-8455 | Access Storage<br>2900 Review Ave.<br>Long Island City, NY 11101<br>Fada Chen<br>347-320-4535 | 1 pallet / 1600 lbs |
| 1/10/2020 | Extra Space Storage<br>14750 Foothill Blvd.<br>Fontana, CA 92335<br>Long<br>626-525-9436 | Public Storage<br>3204 Northern Blvd.<br>Long Island City, NY 11101<br>Fada Chen<br>646-610-2285 | 1 pallet / 500 lbs |
| 1/6/2020 | G F storage<br>1357 E 73rd Ave, D 17<br>Denver, CO 80229<br>Bao<br>702-213-2888 | Extra Space Storage<br>12977 W 63rd Street #69<br>Shawnee, KS 66216<br>John<br>405-570-9482 | 1 pallet / 400 lbs |
| 12/17/2019 | Extra Space Storage<br>14750 Foothill Blvd.<br>Fontana, CA 92335<br>Long<br>626-525-9436 | Public Storage<br>3204 Northern Blvd.<br>Long Island City, NY 11101<br>Fada Chen<br>646-610-2285 | 1 pallet / 400 lbs |
| 12/10/2019 | Extra Space Storage<br>14750 Foothill Blvd<br>Fontana, CA 92335<br>Long<br>626-525-9436 | Public Storage<br>3204 Northern Blvd<br>Long Island City, NY 11101<br>Fada Chen<br>646-610-2285 | 1 pallet / 400 lbs |
| 12/2/2019 | Extra Space Storage<br>14750 Foothill Blvd.<br>Fontana, CA 92335<br>Long<br>626-525-9436 | Public Storage<br>3204 Northern Blvd.<br>Long Island City, NY 11101<br>Fada Chen<br>646-610-2285 | 1 pallet / 450 lbs |

| Date | Shipper | Consignee | Note |
|---|---|---|---|
| 11/22/2019 | Extra Space Storage<br>14750 Foothill Blvd<br>Fontana, CA 92335<br>Long<br>626-525-9436 | Public Storage<br>3204 Northern Blvd.<br>Long Island City, NY 11101<br>Fada Chen<br>646-610-2285 | 1 pallet / 400 lbs |
| 10/7/2019 | Extra Space Storage<br>14750 Foothill Blvd<br>Fontana, CA 92335<br>Peigin Hsieh<br>626-346-6380 | Extra Space Storage<br>12977 W 63rd Street #69<br>Shawnee, KS 66216<br>Kevin<br>681-888-3888 | 1 pallet / 450 lbs |
| 9/17/2019 | Extra Space Storage<br>14750 Foodhill Blvd.<br>Fontana, CA 92335<br>Peigin Hsieh<br>626-346-6380 | Ensign Storage<br>399 N. 130the Street #415<br>Bonner Springs, KS 66012<br>Kevin<br>681-888-3888 | 1 pallet / 450 lbs |
| 8/27/2019 | G F Storage<br>1357 E 73rd Ave, D 17<br>Denver, CO 80229<br>Kevin<br>681-888-3888 | Ensign Storage<br>399 N. 130th Street #415<br>Bonner Springs, KS 66012<br>Kevin<br>681-888-3888 | 1 pallet / 400 lbs |
| 8/14/2019 | Extra Space Storage<br>14750 Foothill Blvd,<br>Fontana, CA 92335<br>Pei<br>909-330-8611 | Ensign Storage<br>399 N. 130th Street #415<br>Bonner Springs, KS 66012<br>Kevin<br>681-888-3888 | 1 pallet / 500 lbs |
| 7/22/2019 | Extra Space Storage<br>17197 Valley Blvd<br>Fontana, CA 92335<br>Pei<br>909-330-8611 | Ensign Storage<br>399 N. 130th Street<br>Bonner Springs, KS 66012<br>Kevin Z<br>681-888-3888 | 1 pallet / 450 lbs |
| 7/19/2019 | Extra Space Storage<br>17197 Valley Blvd<br>Fontana, CA 92335<br>Pei<br>909-330-8611 | Storage Plus<br>3460 Review Ave.<br>Long Island City, NY 11101<br>Juiche Teng<br>415-910-0172 | 1 pallet / 450 lbs |
| 7/8/2019 | Extra Space Storage<br>17197 Valley Blvd.<br>Fontana, CA 92335<br>Pei<br>909-330-8611 | G & F Storage<br>1357 E 73rd Ave. D17<br>Denver, CO 80229<br>Juiche Teng<br>415-910-0172 | 1 pallet / 450 lbs |
| 6/24/2019 | Extra Space Storage<br>17197 Valley Blvd.<br>Fontana, CA 92335<br>Pei<br>415-910-0172 | G & F Storage<br>1357 E 73Rd Ave. A17<br>Denver, CO 80229<br>Juiche Teng<br>415-910172 | 1 pallet / 450 lbs |

AFFIDAVIT OF TFO MIKE AFALAVA - 11
(USAO 2020R00758)

**Seattle Air Cargo**

22.     On Monday April 27, 2020, the manager of East Valley Storage, Chris Kono, called Det. Yagi to advise him "the suspects" (Chris' words) were back, and that another large U-Haul type delivery truck was in front of storage unit E354.  Chris also noted a dark-colored 4-Runner was also parked in front of E354.

23.     Det. Yagi asked Chris to try and identify the license plate, and Chris stated it was "BSG2777."  A check of DOL databases showed that license plate number returned to a 2019 Toyota Runner registered to Chaobin YU, with a listed address of 11125 SE 183rd Pl, Renton.  I believe this was the same Toyota 4-Runner seen in the dash camera video footage described above, when PFS picked up the shipment of marijuana from NG on April 20, 2020.  Det. Yagi later reviewed surveillance video footage from East Valley Storage and saw males rolling out a large crate from unit E354. The crates were then loaded on to a delivery truck.  As the delivery truck was leaving East Valley Storage, the words "Seattle Air Cargo" could be read on the side of the truck.

24.     About two weeks later, on May 11, 2020, at approximately 9:42 am, investigators learned that NG's white BMW X5 arrived at East Valley Storage.[1] Surveillance video showed the BMW driving to unit E354 and meeting with the driver of a Toyota 4-Runner.  It appears at least two people were in the BMW, as the passenger got out to open the storage unit.

25.     At approximately 11:15 am, a white box truck arrived at East Valley Storage.  Minutes before the box truck arrived, surveillance video showed an Asian male entering the East Valley Storage management office.  When the box truck arrived, the Asian male left the management office and walked to the gate entrance, where he entered the gate access code, allowing the box truck to enter the storage facility.  Writing on the box truck read "Seattle Air Cargo."

---

[1] Although I had obtained a warrant from King County Superior Court Judge Marshall Ferguson authorizing installation of a GPS tracker on Ken NG's white BMW X5 on May 8, 2020, I was unable to install the device until May 13, 2020.

AFFIDAVIT OF TFO MIKE AFALAVA - 12
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

26.     The Asian male then led the box truck to storage unit E354.  As soon as the box truck parked, two males using a pallet jack pushed out a large parcel that appeared to be shrink-wrapped.  That parcel was loaded onto the truck, followed by a second large parcel.  At approximately 11:23 am, surveillance video showed the box truck drive away from storage unit E354.  The BMW X5 drove to the front gate to enter the access code, allowing the box truck to exit.  The BMW X5 then waited at the front gate for approximately three minutes before exiting the facility and driving away.  The Toyota 4-Runner left the storage unit shortly thereafter and drove away.



27.     At approximately 12:00 pm, TFO Kevin Johnson and I went to Seattle Air Cargo, located at 19111 Des Moines Memorial Dr. S., SeaTac, Washington. Employees confirmed their driver had picked up the parcels from East Valley Storage, and that the driver was still in transit to the Seattle Air Cargo facility.  The employees also said Seattle Air Cargo was contracted through American Linehaul to pick up the parcels, and that when the parcels arrived at the Seattle Air Cargo warehouse they were scheduled to be picked up by a separate delivery company, Summit NW, which would then take the parcels to their warehouse in Kent.

28.     TFO Johnson and I went to Summit NW, located at 21607 88th Ave. S., Kent.  Employees there were unable to provide much detail, but referred investigators to American Linehaul.  Investigators called American Linehaul and were informed the

AFFIDAVIT OF TFO MIKE AFALAVA - 13
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

parcels were scheduled to arrive at a warehouse in Elizabeth, New Jersey, on May 15, 2020, and would then be delivered to their final destination by a separate delivery company, Cartage By Direct. American Linehaul advised the listed consignee of the parcels was a business named "Lighting A Flush, LLC."  The delivery address for the parcels was 3521 Victory Blvd., Unit 18, Staten Island, NY, and the parcels were described as containing lighting equipment.  The total weight for both parcels was 1,600 pounds.  Investigators contacted agents in New Jersey and New York; agents in New Jersey are assisting in this investigation.

29.   DEA Special Agent (SA) Michael Lieblich contacted me in the morning of May 15, 2020, and informed me the shipment which left East Valley Storage in Kent on May 11, 2020 had arrived in New Jersey.  Agents did not interdict the parcels, but conducted surveillance as they were shipped to their final destination in Staten Island, New York.



**East Valley Storage Unit F405**

30.   That same day, May 15, 2020, Seattle Air Cargo notified me that a shipment of three crates (totaling 2,050 pounds) was scheduled for pick-up from East Valley Storage.  According to information provided by Seattle Air Cargo employees, the contents of the shipment were described as "lighting equipment."  The order (#EWR2942522) listed "Ben" as the shipping contact, with phone number 425-529-8750. The consignee was listed as "Kung," with a phone number of 415-361-1609.  The pick-up instructions stated, "Driver must call Ben 30 minutes prior to pick up."  The shipper

AFFIDAVIT OF TFO MIKE AFALAVA - 14
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  information was listed as East Valley Storage, 18250 E Valley Hwy, Kent, WA, and the

2  consignee information was listed as Lighting A Flush LLC, 3521 Victory Blvd., Unit 18,

3  Staten Island, NY.

4      31.    Surveillance cameras at East Valley Storage captured footage of a gray

5  Toyota Camry leading the Seattle Air Cargo delivery truck into the storage facility,

6  driving past unit E354.  The delivery truck drove toward the area of unit F405. [2]

7  Although surveillance footage showed the rear of the Seattle Air Cargo truck, there was

8  no footage of the truck at unit F405.  After approximately ten minutes, surveillance

9  footage showed the Seattle Air Cargo truck leaving the storage facility.  DEA Group

10 Supervisor (GS) Dan Olson was able to see the delivery truck leave, and also confirmed

11 the license plate of the gray 2012 Toyota Camry (BSS4483).  DOL records showed the

12 Camry is registered to Hong CUI; GS Olson compared CUI's DOL photo to his

13 surveillance observations and identified CUI as the driver of the Camry.

14     32.    Detective Yagi asked East Valley Storage for information on unit F405, and

15 learned that a male named Juiche Teng was the renter of this unit.  Of note, Juiche Teng

16 is also on the contract for all of the Freiqghtquote.com shipments referenced above.  East

17 Valley Storage records also showed that Teng initially rented unit G440 at East Valley

18 Storage on July 11, 2016, but moved to unit F405 on March 11, 2017.

19     33.    On May 21, 2020, an East Valley Storage employee notified Det. Yagi that

20 a gray van (bearing NY license plate HUJ7421) was parked at unit F405.  Records

21 showed the plate registered to a 2015 Toyota Sienna owned by CUI.  New York records

22 showed CUI's listed New York address was 33-38 Parsons Blvd. 4F, Flushing, NY

23 11354; DOL records showed CUI also has a Washington driver's license, with a listed

24

25

26

27  [2] On May 15, 2020, East Valley Storage Manager Chris Kono informed Det. Yagi that he believed unit F405 had
    similar characteristics to unit E354. Chris advised that Asian males were paying for the unit in cash, and would have
28  shipments picked up, using Seattle Forward Air.  Chris stated crates were being made in the storage unit and sent out
    weekly.

AFFIDAVIT OF TFO MIKE AFALAVA - 15
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  address of 1426 SW 344th Pl, Federal Way.  GS Olson, TFO Aaron McAuley, and I

2  responded and set up surveillance around the storage complex.

3       34.     I obtained CUI's DOL photo and conducted physical surveillance at unit

4  405.  I saw CUI walking in and out of storage unit F405.  At approximately 4:01 pm,

5  CUI's Toyota Sienna left the storage complex and drove across the street to Jersey

6  Mike's Subs, where it reversed into a parking stall on the west side of the store.  I saw a

7  Toyota Camry park in a stall next to the Sienna, and watched as CUI got out of the

8  Sienna and into the driver's seat of the Camry and as an unknown Asian male got out of

9  the Camry and into the driver's seat of the Sienna (i.e., they switched vehicles).  CUI then

10 drove back to East Valley Storage in the Camry.

11      35.     CUI stayed at East Valley Storage until 4:16 pm, when he left and drove

12 back across the street to Jersey Mike's Subs.  He parked next to the Sienna, and he and

13 the unknown Asian male spoke briefly before the male got into the Camry and CUI got

14 into the Sienna (i.e., they again switched vehicles).  CUI next drove to the Great Wall

15 Mall, in the Sienna.  The Great Wall Mall is the neighboring business just to the north of

16 East Valley Storage.  CUI drove to the northeast corner of the parking lot and pulled into

17 a parking place.  Surveillance units could not see if CUI met with anyone.  After about

18 ten minutes, the Sienna drove across the street to Planet Fitness.  TFO McAuley observed

19 the Sienna meet with a 2016 Mercedes GLE.  TFO McAuley saw the trunk of the

20 Mercedes open, then quickly close, but could not see any exchange between the driver of

21 the Sienna and the driver of the Mercedes GLE.  The two vehicles then immediately

22 parted ways.

23      36.     After the exchange with the Mercedes, the Sienna drove back to the Great

24 Wall Mall, where it drove through the parking lot and parked next to a 2019 Lexus GS

25 sedan.  Surveillance units were unable to witness an exchange between those two

26 vehicles.  The Sienna then returned to East Valley Storage.  At approximately 4:49 pm,

27 TFO McAuley drove by unit F405, and observed CUI carrying a black trash bag into the

28 storage unit. CUI remained at the storage unit until approximately 6:13 pm, until he left

AFFIDAVIT OF TFO MIKE AFALAVA - 16
(USAO 2020R00758)

and again drove to the Great Wall Mall.  Surveillance units found the Sienna parked in
the south area of the parking lot.  At approximately 6:58 pm, I entered the mall and
observed CUI sitting in the AT&T store.  About 30 minutes later, TFO Natalie Mounts
and her narcotics canine, Ginger, conducted a sniff of the Toyota Sienna.  TFO Mounts
advised that Ginger gave a positive alert.[3]

37.     At approximately 7:47 pm, I observed CUI leaving the store and returning
to his Sienna.  Surveillance units followed CUI to 24340 35th Ave. S, Kent, where CUI
parked in front of the residence.  I saw CUI walking towards the residence, but was
unable to see him go inside.  Parked in front of the residence on 35th Ave. S, was the
same Toyota Camry (bearing WA license BSS4483, registered to CUI) agents had seen at
East Valley Storage on May 15, 2020.

**Seizure of $2,000,000-plus on June 15, 2020**

38.     On June 9, 2020, at approximately 12:20 pm, I observed (via an East Valley
Storage surveillance camera) a white box truck making a delivery to Unit E354.  On the
driver's side door of the box truck, I saw a sticker reading "Abi Trucking."  Ken NG's
BMW X5 was parked at the storage unit.  From the surveillance footage, I could see a
large parcel wrapped in black plastic being removed from the truck and hauled into unit
E354.  I called East Valley Storage management and asked the manager to write down
the license plate of the box truck.  The manager advised me the license plate number was
WA C46202E; DOL records show this vehicle is registered to Abi Trucking.

39.     On June 15, 2020, Seattle Air Cargo alerted me to a shipment they were
scheduled to pick up at East Valley Storage.  The order consisted of four crates, totaling
2,850 pounds.  The shipping form listed the contents as lighting equipment that was being

---

[3] K9 Ginger and TFO Mounts are currently certified as a Narcotics Detection Canine Team under Washington Administrative Code (WAC) 139.05.915.  They were originally certified together under this WAC on November 10, 2018, after 292.5 hours of initial training, and re-certified on September 17, 2019.  K9 Ginger is trained to alert on the odor of cocaine, crack cocaine, methamphetamine, heroin, and marijuana.  K9 Ginger is a passive alert canine, which means she gives a sit response after locating the source area where the odor of narcotics is emitting.  This sit response is accepted by current narcotics detection canine standards.  The handler is trained to watch for changes of behavior (alert) the canine exhibits when an odor of narcotics is detected.  Ginger's reward is a ball.

AFFIDAVIT OF TFO MIKE AFALAVA - 17
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   shipped from East Valley Storage to "Lighting A Flush LLC," 3521 Victor Blvd #18,

2   Staten Island, NY.  The shipping form included instructions to call "Ben 30 minutes prior

3   to pick up" at phone number 425-529-8750.

4       40.     GS Olson, TFO Johnson, and I responded to East Valley Storage to conduct

5   surveillance.  I was monitoring the surveillance cameras at East Valley Storage, and saw,

6   prior to our arrival, NG's white BMW X5 parked in front of unit #E354.  Parked behind

7   the BMW was a Lexus sedan (bearing Washington license BMH1408).  East Valley

8   Storage surveillance video also showed a Seattle Air Cargo box truck out in front of the

9   gate at the storage facility; the box truck then drove to the area of unit E354.  Over the

10  course of 11 minutes, four large crates were hauled out of the storage unit and loaded into

11  the Seattle Air Cargo box truck.[4]  The Lexus and NG's BMW then preceded the box

12  truck out of the storage facility.

13      41.     During this same surveillance event, I also saw a white box truck, with the

14  words "Abi Trucking" written on the passenger side door, drive by East Valley Storage.

15  I followed the box truck to a warehouse several blocks south of East Valley Storage and

16  was able to speak with the driver, who remembered making a delivery to East Valley

17  Storage.  The driver stated he was dispatched by Forward Air to make the delivery.

18      42.     At approximately 5:00 pm (still on June 15, 2020), GS Olson and I went to

19  Forward Air, located at 2507 Frank Albert Rd. E, Unit C, Fife, Washington, where we

20  spoke with company managers, who advised they had delivered three shipments from

21  their Fife warehouse to East Valley Storage, beginning on May 18, 2020.  They also told

22  us that a new shipment had arrived from New York, that same day, and was in their

23  warehouse.  On all four of these shipments, the shipper and receiver information was the

24  same: the listed contact name was "Tom" (no last name) with an origination city of

25  Flushing, New York.  The listed receiver's contact name was Fada Chen, and the listed

26

27

---

28  [4] Agents would later learn from their counterparts with the DEA in Staten Island, New York, that this shipment was
    seized on June 19, 2020, and found to contain 623.2 kilograms of processed marijuana.

AFFIDAVIT OF TFO MIKE AFALAVA - 18
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   receiving address was East Valley Storage, 18250 E. Valley Hwy, Kent, Washington.

2   Fada Chen is the same person listed on the rental paperwork for unit E354 at East Valley

3   Storage.

4       43.     GS Olson and I inspected the parcel that had arrived at Forward Air from

5   New York that same day (Tracking #71841695), and saw it was wrapped in black plastic.

6   The parcel was an approximate four-foot cube, with a listed weight of 554 pounds, and

7   stated contents of "garden equipment."  TFO Mounts and K9 Ginger came to the

8   warehouse and conducted a sniff of the parcel.  TFO Mounts advised that K9 Ginger

9   alerted to the parcel.

10      44.     On June 16, 2020, I obtained a search warrant from King County Superior

11  Court Judge Suzanne Parisien for the parcel.  That same day, investigators went to

12  Forward Air in Fife, to serve the warrant and open the parcel.  As depicted in the

13  photographs below, we removed the black plastic from the crate.  The crate contained

14  boxes surrounded by unopened rolls of "Miracle Soft" paper towels.  Investigators

15  removed the paper towels and opened the boxes, which each contained large sums of US

16  currency.  The official count of the seized currency was $2,099,960.00.



22      45.     Of note, during the months of May and June 2020, approximately 10

23  shipments, weighing between 1,000 and 2,800 pounds each, were shipped from East

24  Valley Storage to the East Coast.  The shipper's information for each delivery was the

25  same:  the listed shipper name was Ben (no last name), and the instructions were to call

26  Ben 30 minutes prior to pick-up at phone number 425-529-8750.  The consignee

27  information for each delivery was Lighting A Flush LLC, 3521 Victory Blvd., Unit 18,

28  Staten Island, NY.  The listed consignee name was Kung (no last name), with a listed

AFFIDAVIT OF TFO MIKE AFALAVA - 19
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   phone number of 415-361-1609.  SA Lieblich monitored the shipments arriving in New
2   Jersey.  The shipments would arrive at a warehouse in New Jersey, and were then picked
3   up and delivered to their final destination in Staten Island, New York.  New Jersey
4   investigators have been able to identify several individuals in New Jersey and New York
5   who they believe are involved with the shipments.  Investigators believe all of these
6   shipments from East Valley Storage to the East Coast contained processed marijuana.
7   Investigators also believe that the other three packages Forward Air had received from
8   New York (for delivery to Fada Chen at East Valley Storage) between May 18 and June
9   15, 2020, contained cash drug proceeds from the sale of marijuana.

10  **Arrests of CUI, NG, and Chaobin YU on June 17, 2020**

11      46.    On June 17, 2020, investigators established surveillance around East Valley
12  Storage.  Investigators saw CUI's Toyota Camry (bearing Washington license BSS4483)
13  driving in the Great Wall Mall parking lot.  I initiated a stop of the Camry; TFO Henry
14  Linehan a fluent Mandarin Chinese speaker, arrested CUI and advised him of his
15  *Miranda* warnings.  CUI did not provide information regarding his involvement in the
16  trafficking of marijuana.

17      47.    At approximately 12:13 pm, investigators observed (via GPS vehicle
18  tracking of NG's BMW X5, authorized in King County Superior Court) data that the
19  BMW was driving towards NG's residence on Talbot Rd. S, in Renton.  GS Olson
20  located the BMW, activated his emergency lights, and pulled the vehicle over.  NG was
21  the driver, and Chaobin YU was in the passenger seat.  Investigators arrested NG and
22  YU, and searched them both incident to arrest.  Investigators located $380 cash on NG's
23  person and $802 cash on YU's person.  Inside of YU's wallet was his identification and a
24  Connecticut driver's license in the name Fada Chen.

25      48.    NG said he understood English, but YU did not.  I asked NG for permission
26  to search his BMW X5, which he granted.  In the rear, near the spare tire area,
27  investigators found a small black pouch and a black wallet.  Inside the wallet was a
28  Washington driver's license in the name Jian Wu.  Inside the pouch was $4,800 cash.

AFFIDAVIT OF TFO MIKE AFALAVA - 20
(USAO 2020R00758)

1  Investigators also found two cell phones, an iPhone on the driver's seat (which NG

2  verbally confirmed was his), and a phone on the passenger seat (which NG stated

3  belonged to YU).

4          49.     I took custody of NG's BMW X5 and drove it to the Great Wall Mall.

5  Separately, GS Olson drove NG, and SA Wetteland drove YU, to the Great Wall Mall.

6  When NG and YU arrived, I informed NG of his *Miranda* rights.  NG said he understood

7  and did not wish to speak to investigators, so we did not ask him any further questions.

8          50.     At this point, NG and YU were standing in close proximity to CUI (who

9  was also in custody).  TFO Linehan asked CUI if he recognized either NG or YU.  CUI

10  replied that he did not recognize either man, and said he had never seen either of them

11  before.  TFO Linehan then spoke to YU.  TFO Linehan asked YU if he understood

12  Chinese, and YU replied that he did.  TFO Linehan asked YU if he could read Chinese

13  characters, and YU replied that he could. TFO Linehan allowed YU to view his (TFO

14  Linehan's) cellphone on which the *Miranda* rights were displayed, written in simplified

15  Mandarin Chinese.  After YU appeared to have finished reading the rights displayed on

16  the phone screen, TFO Linehan asked YU if he understood.  YU stated he did.  TFO

17  Linehan then played for YU an audio recording of the same *Miranda* rights YU had just

18  acknowledged reading.  After the audio recording ended, TFO Linehan again asked YU if

19  he understood his rights.  YU stated he did.  TFO Linehan then asked YU if he agreed to

20  speak with the police, and YU stated he did.

21          51.     TFO Linehan asked YU if he was selling marijuana, or growing marijuana

22  plants.  YU stated he was not doing either.  YU then stated he smoked marijuana, and

23  declined to speak any further with TFO Linehan.  TFO Linehan and I transported NG,

24  YU, and CUI to the Kent jail, where they were booked and released on state charges of

25  Delivery of a Controlled Substance (Marijuana).

26  **Execution of Search Warrants on June 17, 2020**

27          52.     That same day (June 17, 2020), TFO Mounts deployed K9 Ginger at

28  storage units F405 and E354 at East Valley Storage.  TFO Mounts advised investigators

AFFIDAVIT OF TFO MIKE AFALAVA - 21
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   that K9 Ginger indicated to the odor of narcotics at both units.  At the beginning of this

2   investigation, the East Valley Storage manager gave investigators permission to bring a

3   narcotics K9 onto the property.  The units at East Valley Storage are housed outside in a

4   garage-style fashion, where tenants have the ability to freely walk around the property

5   and walk past the doors to each other's units.

6       53.    Det. Yagi then obtained a search warrant from King County Superior Court

7   Judge Suzanne Parisien for storage units F405 and E354.  At about 3:30 pm, we served

8   the warrants.  Investigators did not locate any money or marijuana, but did locate

9   cardboard boxes and large wooden crates in both units, along with a multitude of plastic

10   bottles and documents located on top of apparent "workstations," made from pre-built

11   wooden crates and used as makeshift desks.  Additionally, inside unit E354, investigators

12   located rolls of "Miracle Soft" paper towels (consistent with those used as packaging

13   around the $2 million-plus cash seizure described above), printers, black plastic wrap, a

14   piece of paper that appeared to be a ledger of some sort written in Chinese, and a spiral

15   notebook.  The documents were taken for evidence and future translation.  In unit F405,

16   investigators located a forklift and several large, pre-built wooden crates/containers.

17       54.    I also obtained a search warrant from King County Superior Court Judge

18   Suzanne Parisien for the residences located at 11125 SE 183rd Pl, Renton (YU's

19   residence) and 19700 Talbot Rd, Renton (NG's residence).

20       55.    At about 6:30 pm, investigators served the search warrant on NG's

21   residence (19700 Talbot Rd, Renton).  NG's wife, their two children, and a male named

22   Peter LAI were at the residence.  When Det. Yagi walked up to the residence, Peter LAI

23   had been detained while investigators cleared the home.  Det. Yagi told LAI that he was

24   not the main subject of the investigation and would be free to leave after agents cleared

25   the residence.  SA Wetteland then came out and told Det. Yagi there was a small

26   marijuana grow in one of the rooms.

27       56.    Det. Yagi then told LAI that he wanted to ask him questions about the

28   marijuana grow.  Because LAI was handcuffed, Det. Yagi advised LAI of his *Miranda*

AFFIDAVIT OF TFO MIKE AFALAVA - 22
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    warnings.  LAI stated that he understood his rights and agreed to speak with Det. Yagi.

2    LAI stated that he did not know there was a marijuana grow inside and only came to the

3    home because NG's wife had called him.  LAI stated that Ken NG was his friend.  LAI

4    went on to say that he lived in Chicago and owned a Chinese restaurant.  Det. Yagi asked

5    LAI how he got to the residence that day.  LAI pointed to a white Nissan Quest (bearing

6    Washington license BTA9154) and stated that he drove that vehicle.  DOL records

7    showed the Quest was registered to Peter LAI at 7909 McKinley Ave, Tacoma.[5]

8    57.    Det. Yagi asked LAI if he lived in Washington.  LAI stated that he did not,

9    and reiterated that he lived in Chicago.  LAI told Det. Yagi that he traveled about once a

10    month to Washington for "business."  When Det. Yagi asked LAI what business, LAI

11    told him that he invested in "legal marijuana."  According to Det. Yagi, LAI made sure to

12    emphasize the word "legal."  Det. Yagi obtained LAI's phone number (312-437-1234)

13    and released him.

14    58.    During the search of NG's residence, investigators located 1,290 marijuana

15    plants and a document in the kitchen titled "Annual Certificate of Occupancy," issued

16    March 24, 2020, from Snohomish County Planning and Development Services, for the

17    address 30121 Hillis Rd, Unit A, Arlington, WA 98332-9356.  Investigators recognized

18    this address as one they had followed NG to during surveillance on June 1, 2020.

19    "Laiken LLC" was listed as the occupant, and the authorized occupancy was for cannabis

20    producer/processor.  The property owner was listed as Mark Belles.  The document

21    included a building permit number (# 19 112600 CO).

22    59.    TFO Johnson contacted the Washington State Liquor and Cannabis Board

23    (LCB) about the property at 30121 Hillis Road Unit A, in Arlington, and learned that the

24    property used to be a state-licensed marijuana grow (not under the name "Laiken LLC"),

25    but the licensee had moved its legal operation elsewhere.  On June 18, 2020, Det. Yagi

26

27    [5] Five days later, investigators would learn that LAI had been arrested in December 2019 by the Pierce County
Sheriff's Office at that McKinley Avenue address in connection with the discovery of a large marijuana grow there.

28    LAI was ultimately convicted in Pierce County Superior Court for Unlawful Use of Building for Drug Purposes.

1  again contacted LCB and confirmed the address 30121 Hillis Rd, Unit A, Arlington, did
2  not have a valid license to produce or process marijuana.

3      60.    Also during the search of NG's residence, in a kitchen drawer, Det. Yagi
4  located multiple documents with the name Jian Wu on them.  This was the name on the
5  driver's license found in a wallet located in the rear of NG's vehicle.  One of the
6  documents was a 2013 tax return.  Other documents were paystubs from "Loveridge Hunt
7  and Company" for Jian Ming Wu.  The address on the documents associated with Wu
8  was 6764 28th Ave S #B, Seattle.

9      61.    At approximately 7:00 pm, investigators executed the state-authorized
10  search warrant at YU's residence (11125 SE 183rd Pl, Renton).  As they approached the
11  residence, investigators observed an unoccupied gray Toyota 4-Runner (bearing
12  Washington license BSG2777) parked in the driveway.  This is the same 4-Runner that
13  was at East Valley Storage on April 27, 2020, as described above.  Investigators knocked
14  and announced for approximately 15 seconds while a marked Renton police car activated
15  its emergency lights in front of the residence.  After receiving no answer, investigators
16  breached the front doors to the residence and secured it.  No one was inside.

17      62.    Inside this residence, investigators located a small bag of processed
18  marijuana (131.9 gross grams) in the hallway closest leading into the kitchen/dining room
19  area.  In the kitchen, investigators located numerous documents of interest, including a
20  receipt for $9,233.40 from an indoor marijuana cultivation store called "Hydro 4 Less,"
21  dated January 29, 2020; a receipt for $6,897.83 from "Fed City Hydro," dated February
22  1, 2020; and a utility bill, dated November 26, 2019, for service to 30121 Hillis Road,
23  Arlington, Washington.  The utility bill did not list an exact unit, but this is the same
24  address found on the March 2020 "Annual Certificate of Occupancy" located in NG's
25  kitchen drawer.  The biller name on the utility bill was "Laiken LLC," with an address of
26  526 N West Ave #174, Arlington.

27
28

**Search Warrant at 30121 Hillis Road Unit A, Arlington**

63.     The next day, June 18, 2020, at approximately 3:00 pm, investigators went
to 30121 Hillis Road Unit A, Arlington, and approached the large blue building located
there.  Investigators could see a sign on the front that read, "30121 Unit A."  Upon
arrival, investigators could hear the sound of running fans coming from inside the
building and could see multiple vents on the outside of the building.  On the side of the
building there were four power boxes attached to the power meter.  As investigators
approached the building, there was a strong odor of growing marijuana coming from the
building.  Based on training and experience, and information obtained from the LCB,
investigators believed there was an unauthorized marijuana grow at the location.

64.     Investigators knocked and after a few minutes an Asian male came to the
door.  TFO Linehan spoke to the male and learned there was a second male inside.  The
first male then immediately turned and walked inside the building, so investigators went
with him for officer safety to retrieve the second male.  Both men then came outside.
The two males, later identified as Wanqiang Lie and Chun Lam, said they were working
there for a man named "Ken," whom they met in Seattle.  They said Ken offered them a
job, and at some point Ken brought them to this location to work.

65.     TFO Mounts then obtained a search warrant in King County Superior Court
for 30121 Hillis Road Unit A, Arlington. Washington State Liquor, Tobacco, Vapor, and
Cannabis Enforcement Sgt. Jason Barsness (who again confirmed that "Unit A" did not
have a current license) accompanied investigators during the search warrant service.
After the search warrant was signed, investigators cleared the warehouse.  There were
three large rooms with sophisticated hydroponic indoor watering systems.  The indoor
grow had ballasts, lights, and venting systems.  Investigators seized a total of 1,113
marijuana plants and a black digital video recorder for the surveillance system in the
warehouse.  Investigators saw cameras surrounding the outside of the building and a
multitude of cameras inside the covering most of the main indoor walkways.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1      66.     That same day, Mark Belles (the owner of 30121 Hillis Road, Arlington)

2   emailed investigators the rental contract for the property.  The name on the contract was

3   Laiken, LLC, and it was dated August 13, 2019.  The contract was signed by Ken NG

4   and Jin He (a notation by He's signature read, "spouse of Ken NG").  The contract listed

5   Laiken LLC's phone number as 206-499-6336.  The contract further revealed that

6   starting on September 2019, the tenants began paying the rent of $5,500.  Belles' email

7   also contained Peter LAI's phone number (312-826-7433), email address

8   (peterlai666@gmail.com (**Target Account 3**)), and a physical address in Tacoma.

9      67.     On June 20$^t$, 2020, Belles forward investigators a letter made out to Peter

10   Lai and Ken NG. The two email addresses on the letter were listed as

11   wuken23@gmail.com (**Target Account 4**) and **Target Account 3**.  The letter advised

12   them of the termination of their lease.

13      68.     On June 22, 2020 Det. Yagi called Belles to ask about the relation of Peter

14   LAI to the property located at 30121 Hillis Road, Arlington.  Belles told Det. Yagi that

15   he believed LAI was NG's business partner.  Belles explained that in August/September

16   2019, he posted the property at 30121 Hillis Road, Arlington, on various property

17   rental/lease forums.  Belles stated that LAI was the one who reached out to him enquiring

18   about the property.  Belles further stated that LAI and NG drove out to look at the

19   property.  Belles explained that, based on their questions and social interactions, he

20   believed LAI and NG were partners and said that both men asked questions about

21   utilities, rent, the move-in date, etc.  After the two men signed the rental contract, Belles

22   stated he would include both men on group text messages and emails about the property.

23      69.     Det. Yagi texted Belles a photograph of Peter LAI taken during execution

24   of the search warrant at NG's house on June 17, 2020.  Belles stated that this was the

25   male whom he knew as Peter LAI.  Belles further stated that rent for the property on

26   Hillis Road was paid in cash, usually by NG.

27

28

AFFIDAVIT OF TFO MIKE AFALAVA - 26
(USAO 2020R00758)

**Review of Surveillance Video from Forward Air**

70.     On June 24, 2020, I went to Forward Air, located at 2507 Frank Albert Rd, Fife.  I met with the manager, who gave me three surveillance video files.  Det. Yagi reviewed the video files, and noted that the date was listed as June 17, 2020, and the time was approximately 11:00 am.  This is the approximate time the GPS tracker on NG's BMW X5 showed the vehicle at that location.  Det. Yagi watched the footage from an outside surveillance camera and saw NG's BMW X5 pull up and two Asian males exit the vehicle.  Footage from an inside surveillance camera showed Chaobin YU and NG at the front door.  YU was wearing a black t-shirt and black sweats, while NG was wearing gray sweats with a black jacket.  These were the same clothes they were wearing when we arrested them approximately an hour later.

**Execution of Search Warrants on NG, YU, and CUI's Phones**

71.     On July 15, 2020, Det. Yagi obtained a search warrant from King County Superior Court authorizing the search of the two phones obtained from NG's BMW X5 on June 17, 2020, and a phone seized from Hong CUI incident to his arrest that same day.

72.     On July 21, 2020, Det. John Waldo completed a partial download of data from the three phones.  He advised Det. Yagi that a complete download of data from the phones was not possible.

73.     The phone NG identified as his yielded the following information:  two International Mobile Subscriber Identity (IMSI) numbers (310260166345490 and 310410050481663) were associated with the phone; three Apple IDs (wuken41@icloud.com, dawen.yu@icloud.com, and wu_wu_23@hotmail.com) were associated with the phone; and the phone's number was 206-499-6336.

74.     The phone NG identified as YU's yielded the following information:  the owner's name was listed as "Ben."  There were three IMSI numbers (310260241860178, 310150907245330, and 310260235567618) associated with the phone, possibly indicating multiple phone numbers being used, and two Apple IDs (18138030388@189.cn and chaobinyu1018@gmail.com).  There were two associated

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

phone numbers, 510-386-8073 and 510-386-8073.  There was also an associated email account of yuchaobin1018@gmail.com.

75.     The phone seized from CUI yielded the following information:  the Apple ID associated with the phone was cuihong310@icloud.com, and the phone number was 347-379-3042

76.     I believe there is probable cause to believe that " "Fada Chen," "Juiche Teng," Peter LAI, and Ken NG have used, are using, and will continue to use the **Target Accounts** in furtherance of the criminal activity described in this affidavit.

## IV.     COMMON CHARACTERISTICS OF DRUG TRAFFICKERS

77.     Based on my training and experience, and my discussions with other experienced officers and agents involved in drug investigations, I know the following:

a.     Traffickers of controlled substances, and those who assist them, maintain and tend to retain accounts or records of their drug trafficking activities, including lists of drug quantities and money owed, telephone records including contact names and numbers, photographs, and similar records of evidentiary value. These items are generally kept in locations where drug traffickers believe they will be secure and will remain undetected from law enforcement.

b.     Traffickers of controlled substances commonly maintain addresses, vehicles, or telephone numbers which reflect names, addresses, vehicles, and/or telephone numbers of their suppliers, customers and associates in the trafficking organization and it is common to find drug traffickers keeping records of said associates in cellular telephones and other electronic devices. Traffickers almost always maintain cellular telephones for ready access to their clientele and to maintain their ongoing narcotics business.

c.     Traffickers of controlled substances use cellular phones as a tool or instrumentality in committing their criminal activity. They use them to maintain contact with their suppliers, distributors, and customers. They prefer cellular telephones because, first, they can be purchased without the location and personal

AFFIDAVIT OF TFO MIKE AFALAVA - 28
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

information that land lines require. Second, they can be easily carried to permit the user maximum flexibility in meeting associates, avoiding police surveillance, and traveling to obtain or distribute drugs.  Third, they can be used to access email accounts to send and receive messages with other co-conspirators, and to send and receive messages with entities such as financial institutions and other businesses (e.g., storage facilities).

## V.    BACKGROUND KNOWLEDGE REGARDING ONLINE SERVICES

78.    Based on my training and experience, and information from other experienced agents, I know the following:

79.    Information stored in connection with an online account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.

80.    The information stored in connection with an online account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.

81.    Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's

AFFIDAVIT OF TFO MIKE AFALAVA - 29
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  account may further indicate the geographic location of the account user at a particular
2  time (e.g., location information integrated into an image or video sent via email).

3       82.    Stored electronic data may provide relevant insight into the email account
4  owner's state of mind as it relates to the offense under investigation. For example,
5  information in the email account may indicate the owner's motive and intent to commit a
6  crime (e.g., communications relating to the crime), or consciousness of guilt (e.g.,
7  deleting communications in an effort to conceal them from law enforcement).

8       83.    In my training and experience, and through information from other
9  experienced agents, I have learned that Google provides a variety of on-line services,
10 including electronic mail ("e-mail") access and instant messaging (otherwise known as
11 "chat" messaging), to the general public. Google provides subscribers e-mail and chat
12 accounts at the domain name "@gmail.com." Google also allows subscribers to register a
13 custom domain name and set up Google services such as chat and e-mail using that
14 domain name instead of "@gmail.com."

15      84.    Subscribers obtain an account by registering with Google. When doing so,
16 e-mail providers like Google ask the subscriber to provide certain personal identifying
17 information. This information can include the subscriber's full name, physical address,
18 telephone numbers and other identifiers, alternative e-mail addresses, and, for paying
19 subscribers, means and source of payment (including any credit or bank account number).
20 In my training and experience, such information may constitute evidence of the crimes
21 under investigation because the information can be used to identify the account's user or
22 users, and to help establish who has dominion and control over the account.

23      85.    E-mail providers typically retain certain transactional information about the
24 creation and use of each account on their systems.  This information can include the date
25 on which the account was created, the length of service, records of log-in (i.e., session)
26 times and durations, the types of service utilized, the status of the account (including
27 whether the account is inactive or closed), the methods used to connect to the account
28 (such as logging into the account via Google's website), and other log files that reflect

AFFIDAVIT OF TFO MIKE AFALAVA - 30
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  usage of the account.  In addition, e-mail providers often have records of the Internet

2  Protocol address ("IP address") used to register the account and the IP addresses

3  associated with particular logins to the account.  Because every device that connects to

4  the Internet must use an IP address, IP address information can help to identify which

5  computers or other devices were used to access the e-mail account, which can help

6  establish the individual or individuals who had dominion and control over the account.

7       86.     In some cases, e-mail account users will communicate directly with an e-

8  mail service provider about issues relating to the account, such as technical problems,

9  billing inquiries, or complaints from other users. E-mail providers typically retain records

10  about such communications, including records of contacts between the user and the

11  provider's support services, as well records of any actions taken by the provider or user as

12  a result of the communications. In my training and experience, such information may

13  constitute evidence of the crimes under investigation, because the information can be

14  used to identify the account's user or users.

15      87.     In general, an e-mail that is sent to a Google subscriber is stored in the

16  subscriber's "mail box" on Google's servers until the subscriber deletes the e-mail.  When

17  the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the

18  Internet to Google servers, and then transmitted to its end destination.  Google often

19  maintains a copy of received and sent e-mails.  Unless the sender of the e-mail

20  specifically deletes the e-mail from the Google server, the e-mail can remain on the

21  system indefinitely.  Even if the subscriber deletes the e-mail, it may continue to be

22  available on Google's servers for a certain period of time.

23      88.     A sent or received e-mail typically includes the content of the message,

24  source and destination addresses, the date and time at which the e-mail was sent, and the

25  size and length of the e-mail.  If an e-mail user writes a draft message but does not send

26  it, that message may also be saved by Google but may not include all of these categories

27  of data.

28

AFFIDAVIT OF TFO MIKE AFALAVA - 31
(USAO 2020R00758)

89.     In addition to e-mail and chat, Google offers subscribers numerous other services including: Android, Blogger, Google Alerts, Google Calendar, Google Chrome Sync, Google Cloud Print, G-Suite, Google Developers Console, Google Drive, Google Hangouts, Google Maps, Google Payments, Google Photos, Google Search Console, Google Voice, Google+, Google Profile, Location History, Web & Activity, and YouTube, among others. Thus, a subscriber to a Google account can also store files, including address books, contact lists, calendar data, photographs and other files, on servers maintained and/or owned by Google. For example, Google Calendar is a calendar service that users may utilize to organize their schedule and share events with others. Google Drive may be used to store data and documents, including spreadsheets, written documents (such as those created in Microsoft Word) and other documents that could be used to manage a website. Google Photos can be used to create photo albums, store photographs, and share photographs with others and "You Tube," allows users to view, store and share videos. Google Search Console records a Google account user's search queries. Google Web & Activity records certain browsing history depending on whether the account holder is logged into their account. Like many internet service companies, the services Google offers are constantly changing and evolving.

90.     Based upon my training and experience, all of these types of information may be evidence of crimes under investigation. Stored e-mails and chats not only may contain communications relating to crimes, but also help identify the participants in those crimes.  For example, address books and contact lists may help identify and locate co-conspirators.  Similarly, photographs and videos of co-conspirators may help identify their true identities, as opposed to supposed identities that they have used in telephone or e-mail communications. Documents such as Google sheets may identify the scope of the criminal activity.  Calendar data may reveal the timing and extent of criminal activity. Search and browsing history can also be extremely useful in identifying those using anonymous online accounts and may also constitute direct evidence of the crimes under investigation to the extent the browsing history or search history might include searches

AFFIDAVIT OF TFO MIKE AFALAVA - 32
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  and browsing history related to storage services, freight forwarding companies, premises

2  for rent at which marijuana might be grown, money laundering, and other evidence of the

3  crimes under investigation or indications of the true identity of the account users.

4        91.    Google is also able to provide information that will assist law enforcement

5  in identifying other accounts associated with the Target Accounts, namely, information

6  identifying and relating to other accounts used by the same subscriber.  This information

7  includes any forwarding or fetching accounts[6] relating to the Target Accounts, all other

8  Google accounts linked to the Target Account because they were accessed from the same

9  computer (referred to as "cookie overlap"), all other Google accounts that list the same

10  SMS phone number as the Target Accounts, all other Google accounts that list the same

11  recovery e-mail addresses[7] as do the Target Accounts, and all other Google accounts that

12  share the same creation IP address as the Target Accounts. Information associated with

13  these associated accounts will assist law enforcement in determining who controls the

14  Target Accounts and will also help to identify other e-mail accounts and individuals

15  relevant to the investigation.

16        92.    According to Google's website, "Location Reporting" allows Google to

17  periodically store and use a device's most recent location data in connection with the

18  Google Account connected to the device.  "Location History" allows Google to store a

19  history of location data from all devices where a user is logged into their Google Account

20  and have enabled Location Reporting.  According to Google "[w]hen you turn on

21  Location Reporting for a device like your iPhone or iPad, it lets Google periodically store

22  and use that device's most recent location data in connection with your Google Account."

23  How often Location Reporting updates location data is not fixed.  Frequency is

24

---

25  [6] A forwarding or fetching account related to a particular Target Account would be a separate email account that can
26  be set up by the user to receive copies of all the email sent to the Target Account.

27  [7] A recovery email address is an additional email address supplied by the user of a particular Target Account that is
used by Google to confirm the username after the user creates an email account, help the user if the user has trouble
28  signing into the user's Google account or has forgotten the user's password, or alert the user to any unusual activity
involving the Target Account.

1  determined by factors such as how much battery life the device has, if the device is

2  moving, or how fast the device is moving.  Google's location services may use GPS, Wi-

3  Fi hotspots, and cellular network towers to determine an account holder's location.

4  93.    Based on the above, I know that if a user of a gmail email account utilizes a

5  mobile device to access that account and has not disabled location services on his or her

6  device/s or through the Google account settings, Google may have detailed records of the

7  locations at which the account holders utilized the mobile device/s. This type of evidence

8  may further assist in identifying the account holders, and lead to the discovery of other

9  evidence of the crimes under investigation.

10  94.    I know that Google's Android service collects and stores identifying

11  information about an Android smart phone used to access the Google account, including

12  the International Mobile Equipment Identifier (IMEI), International Mobile Subscriber

13  Identity (IMSI), telephone number and mobile carrier code. I know that Google's

14  Location History service periodically queries the physical location of a device that is

15  currently accessing a Google account through the device's GPS, nearby Wi-Fi network

16  IDs and cellular tower information and records a history of device movements in

17  Google's servers.

18  **VI.    INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

19  95.    Pursuant to Title 18, United States Code, Section 2703(g), this application

20  and affidavit for a search warrant seeks authorization to require Google, and its agents

21  and employees, to assist agents in the execution of this warrant.  Once issued, the search

22  warrant will be presented to Google with direction that it identify the Target Accounts

23  described in Attachment A to this affidavit, as well as other subscriber and log records

24  associated with the Target Accounts, as set forth in Section I of AttachmentsB to this

25  affidavit.

26  96.    The search warrant will direct Google to create an exact copy of the

27  specified accounts and records, including an exact copy of the contents of the hard disk

28

AFFIDAVIT OF TFO MIKE AFALAVA - 34
(USAO 2020R00758)

1  drive or drives installed on the server associated with the **Target Accounts**, or the

2  original drives

3      97.    Google shall then provide the exact digital copies of the specified accounts,

4  records, and contents of the hard disk drive or drives installed on the server associated

5  with the **Target Accounts** to me, or to any other agent of the DEA.  Once we have

6  received the copies from Google, they will, in turn, be forensically imaged and only that

7  forensic image will be reviewed and analyzed to identify communications and other data

8  subject to seizure pursuant to Section II of Attachment B.  The original digital copies will

9  be sealed and maintained to establish authenticity, if necessary.

10      98.    I, and/or other agents of the DEA will thereafter review the forensic

11  images, and identify from among that content those items that come within the items

12  identified in Section II to Attachment B, for seizure.  I, and/or other agents of the DEA

13  will then copy those items identified for seizure to separate media for future use in the

14  investigation and prosecution.  The forensic copy of the complete content of the e-mail

15  accounts will also then be sealed and retained by the DEA, and will not be unsealed

16  absent authorization from this Court, except for the purpose of duplication of the entire

17  image in order to provide it, as discovery, to a charged defendant.

18      99.    Analyzing the data contained in the forensic image may require special

19  technical skills, equipment, and software.  It could also be very time-consuming.

20  Searching by keywords, for example, can yield thousands of "hits," each of which must

21  then be reviewed in context by the examiner to determine whether the data is within the

22  scope of the warrant.   Merely finding a relevant "hit" does not end the review process.

23  Keywords used originally need to be modified continuously, based on interim results.

24  Certain file formats, moreover, do not lend themselves to keyword searches, as keywords

25  search text, and many common electronic mail, database, and spreadsheet applications,

26  (which may be attached to e-mail,) do not store data as searchable text.  The data is

27  saved, instead, in proprietary non-text format.  And, as the volume of storage allotted by

28  service providers increases, the time it takes to properly analyze recovered data increases,

AFFIDAVIT OF TFO MIKE AFALAVA - 35
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   as well.  Consistent with the foregoing, searching the recovered data for the information

2   subject to seizure pursuant to this warrant may require a range of data analysis techniques

3   and may take weeks or even months.

4        100.    Based upon my experience and training, and the experience and training of

5   other agents with whom I have communicated, it is necessary to review and seize all

6   electronic mails, chat logs and documents, that identify any users of the subject account

7   and any electronic mails sent or received in temporal proximity to incriminating e-mails

8   that provide context to the incriminating communications.

9        101.    All forensic analysis of the image data will employ only those search

10  protocols and methodologies reasonably designed to identify and seize the items

11  identified in Section II of Attachment B to the warrant.

12       102.    Records and files that could otherwise be obtained by subpoena shall

13  remain available, in their entirety, to investigating agents and prosecutors for the duration

14  of the investigation and prosecution.  These include the name and address of the

15  subscriber to or customer of the service; local and long distance telephone connection

16  records; records of session times and durations; length of service and types of services

17  utilized; telephone or instrument number or other subscriber number or identity,

18  including any temporarily assigned network address; and means and source of payment,

19  including any credit card and bank account numbers.

20       103.    If in the course of their efforts to identify and segregate evidence of the

21  items specified in Section II to Attachment B, law enforcement agents or analysts

22  discover items outside of the scope of the warrant that are evidence of other crimes, that

23  data/evidence will not be used in any way unless it is first presented to a Magistrate Judge

24  of this District and a new warrant is obtained to seize that data, and/or to search for other

25  evidence related to it.  In the event a new warrant is authorized, the government may

26  make use of the data then seized in any lawful manner.

27

28

AFFIDAVIT OF TFO MIKE AFALAVA - 36
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

# VII.   REQUEST FOR NON-DISCLOSURE AND SEALING

104.   The government requests, pursuant to the preclusion of notice provisions of Title 18, United States Code, Section 2705(b), that the Provider be ordered not to notify any person (including the subscriber or customer to which the materials relate) of the existence of this warrant for such period as the Court deems appropriate.  The government submits that such an order is justified because notification of the existence of this Order would seriously jeopardize the ongoing investigation.  Such a disclosure would give the subscriber an opportunity to destroy evidence, change patterns of behavior, notify confederates, or flee or continue his flight from prosecution.

105.   It is further respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  This is an ongoing investigation, and the targets do not know the details of what investigators have learned and what evidence has been gathered.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness by resulting in the flight of targets, the destruction of evidence, or the intimidation or influencing of witnesses.

# VIII.   CONCLUSION

106.   Based on the forgoing, I believe there is probable cause to search the **Target Accounts** as further described herein and in Attachment A, for evidence, fruits, and instrumentalities, as further described in Attachment B, of crimes committed by "Juiche Teng," "Fada Chen," Peter LAI, Ken NG, Chaobin YU, and their associates, known and unknown, specifically distribution of controlled substances and related money laundering offenses.

AFFIDAVIT OF TFO MIKE AFALAVA - 37
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

107.    Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested search warrant at any time in the day or night.


Mike Afalava, Affiant
Task Force Officer, DEA


SUBSCRIBED AND SWORN before me this _____9th_____ day of October, 2020


J. RICHARD CREATURA
United States Magistrate Judge

AFFIDAVIT OF TFO MIKE AFALAVA - 38
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

# ATTACHMENT A

## Google Accounts to Be Searched

The electronically stored data, information and communications contained in, related to, and associated with, including all preserved data associated with the following Google accounts (collectively, the "Target Accounts") that are stored at premises controlled by Google LLC ("Google"), a company that is located in Mountain View, California:

1. xinliu111973@gmail.com (Target Account 1)

2. juicheteng@gmail.com (Target Account 2)

3. peterlai666@gmail.com (Target Account 3)

4. wuken23@gmail.com (Target Account 4)

AFFIDAVIT OF TFO MIKE AFALAVA - 39
(USAO 2020R00758)

## ATTACHMENT B

### Items to be Seized from Google

**I.   Section I - Information to be disclosed by Google for search:**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, regardless of whether such information is located within or outside the United States, including any data, messages, records, files, logs, or information that has been deleted but is still available to Google, Google is required to disclose the following information to the government for each account or identifier listed in Attachment A, for the time period of June 24, 2019, to the present:

a.     the contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.     all subscriber records associated with the specified account, including: 1) names, email addresses, and screen names; 2) physical addresses; 3) records of session times and durations; 4) length of service (including start date) and types of services utilized; 5) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address such as internet protocol address, media access card addresses, or any other unique device identifiers recorded by Google in relation to the account; 6) account log files (login IP address, account activation IP address, and IP address history); 7) detailed billing records/logs; 8) means and source of payment; and 9) lists of all related accounts;

c.     any contact lists;

d.     any Google Chat/Messenger information and/or records, including any contact or friend list, time, date, and IP address logs for Chat and Messenger use, and any archived web messenger communications stored on servers;

e.     any Google Calendar content;

AFFIDAVIT OF TFO MIKE AFALAVA - 40
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1       f.      any Google Drive content (including backup of any apps stored on Google

2  Drive);

3       g.      any Google Sheets content;

4       h.      any Google Maps content;

5       i.      any Google Photos content;

6       j.      any Google Search Console content;

7       k.      any Google Web & Activity content;

8       l.      any Google Chrome Sync content;

9       m.      any Google Location History content;

10       n.      any Google Voice content;

11       o.      any Android content;

12       p.      any Google Profile content, including all Google+ content;

13       q.      any account history, including any records of communications between

14  Google and any other person regarding the account, including contacts with technical

15  support services, billing inquiries, or complaints from other users about the specified

16  account.  This is to include records of contacts between the subscriber and Google's

17  support services, as well as records of actions taken by Google or subscriber in

18  connection with the service;

19       r.      all records or other information regarding the identification of the account,

20  to include full name, physical address, telephone numbers and other identifiers, records

21  of session times and durations, the date on which the account was created, the length of

22  service, the IP address used to register the account, log-in IP addresses associated with

23  session times and dates, account status, alternative e-mail addresses provided during

24  registration, methods of connecting, log files, and means and source of payment

25  (including any credit or bank account number); and

26       s.      the types of service utilized.

27

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

**II.  Section II - Information to be seized by the government**

All information described above in Section I that constitutes evidence, fruits or instrumentalities of the crimes of distribution of controlled substances (21 U.S.C. §§ 841(a)(1) and 846) and money laundering (18 U.S.C. § 1956), those violations occurring during the period from approximately June 24, 2019, to the present, for each of the Target Accounts listed in Attachment A, including the following:

a.      evidence that may identify any coconspirators, aiders and abettors, drug suppliers and/or drug customers, including evidence that helps reveal their whereabouts and including evidence of relationship(s) that existed prior to June 24, 2019;

b.      communications, or material related to communications, between coconspirators, sources of supply, customers, and aiders and abettors regarding the above-referenced crimes and communications in furtherance of the above-referenced crimes;

c.      evidence regarding the acquisition, importation, transportation, shipment, mailing, processing, and distribution of marijuana;

d.      evidence regarding items and places used to store, process, package, ship, and/or distribute marijuana;

e.      evidence relating to the acquisition of email accounts or other web services accounts used by the account holder or co-conspirators to facilitate the above-referenced offenses;

f.      evidence regarding payment for controlled substances, including domestic and international wire transfers, and evidence relating to or referring to transfers or transactions of funds;

g.      evidence regarding storage units, such as rental and payment records, billing information, keys and codes, contracts, contact information, and directions;

h.      evidence that may identify assets, including bank accounts, currency (U.S. or foreign), commodities accounts, trading accounts, tax returns, personal property,

1  and/or real estate that may represent proceeds of the above-listed crimes, are traceable to

2  such proceeds, or are involved in money laundering transactions;

3      i.      evidence of domestic or international travel in furtherance of the above-

4  listed offenses;

5      j.      evidence that serves to identify any persons who use or access the account

6  specified, or who exercise in any way any dominion or control over the specified

7  account;

8      k.      evidence that may reveal the current or past location of the individual(s)

9  using the specified account ,including all data stored in connection with location services;

10     l.      evidence indicating how and when the specified account was accessed or

11 used, to determine the chronological and geographic context of account access, use, and

12 events relating to the crimes under investigation and the account user;

13     m.      evidence relating to the specified account user's state of mind as it relates to

14 the crimes under investigation;

15     n.      evidence relating to or referring to changes made to the account settings of

16 any of the Target Accounts, including changes to the username/user ID, contact

17 information, or payment information;

18     o.      evidence that may identify any alias names, online user names, "handles"

19 and/or nicknames of those who exercise in any way any dominion or control over the

20 specified account;

21     p.      other log records, including IP address captures, associated with the

22 specified account;

23     q.      all subscriber records associated with the specified account, including

24 name, address, local and long distance telephone connection records, or records of

25 session times and durations, length of service (including start date) and types of service

26 utilized, telephone or instrument number or other subscriber number or identity,

27 including any temporarily assigned network address, and means and source of payment

28 for such service) including any credit card or bank account number;

AFFIDAVIT OF TFO MIKE AFALAVA - 43
(USAO 2020R00758)

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1      r.     any records of communications between Google and any person about
2  issues relating to the account, such as technical problems, billing inquiries, or complaints
3  from other users about the specified account. This to include records of contacts between
4  the subscriber and Google's support services, as well as records of any actions taken by
5  Google or subscriber as a result of the communications; and

6      s.     information identifying accounts that are linked or associated with the
7  specified account.

AFFIDAVIT OF TFO MIKE AFALAVA - 44
(USAO 2020R00758)